J-A13005-20

2020 PA Super 236

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TIMOTHY OLIVER BARR II | : | No. 2347 EDA 2019 |

Appeal from the Order Entered August 2, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0000279-2019

BEFORE: BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

OPINION BY BENDER, P.J.E.: **FILED SEPTEMBER 25, 2020**

This is a Commonwealth appeal from the trial court's order granting Appellee's, Timothy Oliver Barr II, motion to suppress and *habeas corpus* petition ("*habeas* petition"). In granting Appellee's suppression motion, the trial court held that the odor of marijuana no longer provides police with probable cause to search a motor vehicle from which the odor emanates because a substantial number of Pennsylvania citizens can now consume marijuana legally, calling into question the so-called plain smell doctrine. After careful review, we agree with the trial court that the odor of marijuana does not *per se* establish probable cause to conduct a warrantless search of a vehicle. However, because the trial court failed to afford that factor any weight, and did not appear to evaluate any other factors in conjunction with the odor of marijuana in its probable cause analysis, we vacate the portion of

_____

[*] Retired Senior Judge assigned to the Superior Court.

the order granting suppression and remand for reconsideration by the trial court. We also vacate the portion of the order granting Appellee's *habeas* petition, and remand for reconsideration by the trial court following resolution of the suppression issue.

The Commonwealth charged Appellee with person not to possess a firearm, 18 Pa.C.S. § 6105, possession of a firearm without a license, 18 Pa.C.S. § 6106, and possession of a small amount of marijuana ("PSAM"), 35 Pa.C.S. § 780-113(a)(31)(i), following a warrantless search of his vehicle conducted on November 7, 2018. Appellee filed a motion to suppress the seized firearm and marijuana, and a *habeas corpus* petition seeking dismissal of all charges.[1] The trial court conducted a suppression hearing on July 17, 2019. The court summarized its factual findings from that hearing as follows:

FINDINGS OF FACT

1. On November 7, 2018, at approximately 12:30 A.M., Trooper Edward Prentice and Trooper Danielle Heimbach of the Pennsylvania State Police, Fogelsville Barracks, Troop M, were on routine patrol in full uniform and in a marked police unit on Emaus Avenue in the area of the Liberty Park at Allentown apartment complex, Allentown, Lehigh County, Pennsylvania.[5] At that time, Trooper Prentice observed a silver Chrysler 300 sedan making a U-turn in the Liberty Park at Allentown apartment complex on Allenbrook Drive, and then proceeding east on Emaus Avenue. Trooper Prentice turned his cruiser around and decided to follow the vehicle.[6]

[5] Trooper Prentice was Trooper Heimbach's mentor, as Trooper Heimbach graduated from the police academy on

---

[1] Both the suppression motion and *habeas corpus* petition were incorporated in an omnibus pre-trial motion filed on April 3, 2019.

October 12, 2018. On that night, Trooper Prentice was operating the police cruiser and was Trooper Heimbach's training officer.

[6] No criminal activity was observed at this time. Trooper Prentice based his decision to follow the vehicle on the fact that no other cars were around, the car appeared to be traveling at a fast rate of speed, and the early hour of the night.

2. The subject vehicle drove eastbound on Emaus Avenue and made a left onto Devonshire Road/Mack Boulevard, Allentown, Lehigh County. Trooper Prentice noted that the vehicle was traveling at a fast rate of speed. However, the vehicle slowed down prior to approaching an overpass on which the vehicles are constrained to pass one at a time. Trooper Prentice and Trooper Heimbach observed that the subject vehicle failed to stop at the solid white stop line on the road at the stop sign controlling the single lane railroad overpass at Mack Boulevard and South 8th Street, Allentown, Lehigh County, Pennsylvania.[7] Consequently, observing this motor vehicle violation, a traffic stop was effectuated. The subject vehicle pulled over immediately.

[7] Both the front and rear tires passed over the solid white stop lines prior to slowly rolling through the single lane railroad overpass. At that time, another vehicle was approaching the railroad pass from a distance from the opposite lane of travel. As this vehicle was far away, no danger or safety risk was present.

3. As Trooper Prentice was "coaching" or training Trooper Heimbach, Trooper Heimbach took the lead and exited the police cruiser to investigate.[8] Trooper Heimbach approached the passenger side of the vehicle to speak with the occupants. As she approached, she smelled the odor of burnt marijuana. The driver of the vehicle was a white female, later identified as Teri Barr, [Appellee]'s wife. [Appellee] was seated in the front passenger seat and was speaking with Trooper Heimbach.[9]

[8] Trooper Prentice briefly remained in the police cruiser to perform a records check of the vehicle, as well as to notify dispatch of the traffic stop. The subject vehicle was owned by [Appellee]'s mother.

[9] Co-Defendant Luiz Monteiro was seated in the rear passenger seat behind [Appellee]. He appeared to be either

passed out or in and out of sleep. There was limited interaction with Mr. Monteiro. Co-Defendant Monteiro did not present a medical marijuana card at the time of the traffic stop.

4. After Trooper Prentice completed his tasks in the police cruiser, he approached the vehicle on the driver's side. Upon approach, Trooper Prentice could smell the odor of both burnt and raw marijuana through the open window of the vehicle.[10] At that time, Trooper Prentice asked the driver to exit the vehicle so that he could interview her and confirm that she was not under the influence and incapable of safe driving. He stepped back to make room for her egress from the vehicle. When Trooper Prentice overheard the passenger arguing with Trooper Heimbach and stating[,] "no one is getting out of this fucking car," Trooper Prentice walked back to the driver's side door. The argument ensued for approximately two (2) to three (3) minutes, until members of the Allentown Police Department arrived as backup.[11] When members of the Allentown Police Department arrived, [Appellee]'s attitude changed and he became more cooperative. He exited the vehicle, along with the other occupants. They were patted down for officer safety.

[10] Trooper Prentice testified that he could smell the odor of raw and burnt marijuana through the open window when he was at the rear of the vehicle. This [c]ourt takes issue with this testimony of Trooper Prentice and finds it not to be credible. Indeed, it is only reasonable to conclude that one (1) odor would trump the other odor, and that Trooper Prentice was not able to detect both raw and burnt marijuana. Also, this [c]ourt notes that the amount of raw marijuana located in the vehicle in a sealed Ziploc bag was only .79 grams. It is unfathomable to this [c]ourt that Trooper Prentice was able to detect the odor of both raw and burnt marijuana.

[11] Trooper Prentice had called for assistance when he realized that [Appellee] was not being cooperative and was preventing his wife from complying with [the trooper's] commands and exiting the vehicle.

5. Trooper Prentice advised the occupants of the vehicle that he could search the vehicle pursuant to *Commonwealth v. Gary*, … 91 A.3d 102 ([Pa.] 2014), as the odor of marijuana provided them with probable cause. At that time, [Appellee] presented Trooper

- 4 -

Prentice with a medical marijuana identification card that allows him to possess and ingest medical marijuana pursuant to this license.[12] Trooper Prentice admitted that while he knew that green leafy marijuana was legal for medical purposes, he was not familiar with how a person ingests green leafy medical marijuana.[13] Also, Trooper Prentice was under the misconception that medical marijuana, when ingested through a vaping pen, has no odor.[14]

[12] At the time of the hearing, [Appellee] presented a receipt for medical flower marijuana purchased from a dispensary on November 2, 2018, totaling $85.00. Neither Trooper Prentice nor Trooper Heimbach recalled that [Appellee] presented this receipt to them at the time of the traffic stop.

[13] While in the presence of the Allentown Police Department and captured on the body cam of a member of the Allentown Police Department, Trooper Prentice indicated that "if he's allowed to have it, I'm fine with that. I'm not going to fucking worry about it."

[14] Trooper Heimbach was frank with this [c]ourt and stated that she did not know how medical marijuana was ingested. She also indicated that at the time of the preliminary hearing in this matter (and consequently, at the time of the vehicle stop) she was under the misimpression that green leafy marijuana was illegal and not used for medical purposes.

6. Trooper Heimbach and Trooper Prentice then conducted a probable cause search of the vehicle based on the odor of marijuana that they detected therein. The search of the vehicle yielded marijuana "shake"[15] throughout the cabin area, as well as a sealed Ziploc plastic bag containing marijuana[16] between the front passenger seat and the center console. The marijuana weighed .79 grams. The Ziploc plastic bag did not have any markings or barcodes on it that would be indicative of coming from a medical marijuana dispensary.[17] Trooper Prentice indicated that the odor of burnt marijuana got stronger in the area of the center console of the vehicle.

[15] Trooper Prentice explained that marijuana "shake" served as evidence that marijuana was being smoked in the vehicle, but did not amount to a prosecutorial amount. Indeed, generally "shake" is a residual amount of

- 5 -

marijuana. No photos of the "shake" were taken at the time of the traffic stop.

[16] The suspected marijuana field-tested positive for marijuana.

[17] Trooper Prentice testified that he was trained that medical marijuana has to remain in the original packaging that it is received in from the dispensary, from the time that it is opened until the time that the contents are totally consumed. As the baggie located in the vehicle had no markings on it that were indicative of being medical marijuana, Trooper Prentice grew concerned and skeptical that the contents were medical marijuana. However, Trooper Prentice did acknowledge that he did not know if the packaging of medical marijuana included an inner baggie like the one located in the center console of the vehicle. Similarly, Trooper Heimbach indicated that she did not know how medical marijuana was packaged.

7. In addition, Trooper Prentice searched the rear of the vehicle. On the floor of the rear passenger compartment, tucked halfway under the front driver's seat, Trooper Prentice located a jacket with "OBH" markings on it rolled up in a ball. Therein, Trooper Prentice found a loaded black handgun, with one (1) bullet in the chamber and four (4) rounds in the magazine. Trooper Prentice believed the jacket to belong to [Appellee]. Consequently, Trooper Prentice advised the members of the Allentown Police Department to detain the three (3) occupants of the vehicle. Further search of the vehicle yielded an Apple logo baggie with new clear plastic baggies therein. These small baggies were located in the trunk of the vehicle. Trooper Prentice testified that they were consistent with the packaging of drugs for distribution, as well as the baggie of marijuana found between the front passenger seat and the center console.

8. David Gordon, M.D., a retired heart and lung surgeon in the Lehigh Valley and an expert in the field of medical marijuana, is one of the pioneer physicians in Pennsylvania to assess patients and determine if they have a qualifying condition under the law to be prescribed medical marijuana. Dr. Gordon was the physician who made the recommendation that [Appellee] qualified for a medical marijuana card based on his underlying medical condition/diagnosis.

9. Dr. Gordon explained that there is no distinguishable physical difference between the green leafy medical marijuana and regular marijuana purchased on the streets. Indeed, the chemical compositions are the same. Dr. Gordon further explained how a person lawfully ingests green leafy medical marijuana. He indicated that the green leafy marijuana is placed in a battery-operated vaping pen that heats up the marijuana without combustion, producing a vapor. A person then breathes in the vapors through the vaping pen. Dr. Gordon indicated it is a violation of regulations to smoke medical marijuana without a vaping pen, such as placing it into cigarettes or pipes.

10. Dr. Gordon stated that there is no difference in odor of ingesting the medical marijuana when utilizing a vaping pen and the odor of smoking regular marijuana from an unlawful source.

11. Dr. Gordon is familiar with the packaging of medical marijuana and explained that it can be dispensed in a plastic container similar to a pill bottle, which then has a plastic bag in it containing the medical marijuana. Dr. Gordon believed that the inner plastic bag does contain some marking on it to reflect that it was purchased at a medical marijuana dispensary, but he was not certain. Dr. Gordon advises all of his patients to maintain their receipts to evidence what was purchased.

12. As of now, there are more than 143,000 patients in Pennsylvania legalized to obtain, possess, and ingest medical marijuana.

13. Dr. Gordon opined that there is a clear disconnect between the medical community and the law enforcement community with respect to the legalization of marijuana.

Trial Court Opinion (TCO), 8/2/19, at 2-8 (citations to hearing exhibits omitted).

On August 2, 2019, the trial court issued an opinion and order granting both Appellee's suppression motion and his *habeas* petition.[2] The

_____

[2] The order granted suppression of all evidence obtained during the search of Appellee's vehicle. Order, 8/2/19, at 1 (single page). The order is somewhat

- 7 -

Commonwealth filed a timely notice of appeal on August 8, 2019. On August 15, 2019, the trial court ruled that its August 2, 2019 order granting Appellee's suppression motion and *habeas* petition was a final order. **See** Order, 8/15/19, at 1 (single page) (citing Pa.R.A.P. 341(c) (permitting "the trial court" to "enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case" which then "becomes appealable when entered")). The court did not order the Commonwealth to file a Pa.R.A.P. 1925(b) statement. The trial court filed a Rule 1925(a) opinion, which fully adopted its August 2, 2019 opinion, to address the Commonwealth's claims. **See** Rule 1925(a) Opinion, 8/14/19, at 2. In addition to the briefs filed by the Commonwealth and Appellee, the Defender Association of Philadelphia and the American Civil Liberties Union of Pennsylvania filed an *Amici Curiae* brief ("*Amici* Brief") in support of the order granting suppression.

The Commonwealth now presents the following questions for our review:

> I. Did the trial court err in granting [Appellee]'s motion to suppress the drugs and firearm seized by Pennsylvania State

---

inconsistent with regard to the *habeas* petition. Appellee sought dismissal of all charges in his *habeas* petition, and the order initially indicated that the *habeas* petition was granted. **Id.** However, the order then stated that only the PSAM charge was dismissed. **Id.** The lower court docket also reflects that only the PSAM charge was dismissed by the trial court.

Police where the search of the vehicle in which [he] was a passenger was supported by probable cause?

II. Did the trial court err in granting [Appellee]'s [*habeas* petition] with regard to Count 3, [PSAM,] at the same time it granted [his] [m]otion to [s]uppress and where the Commonwealth established that it was more probable than not that [he] possessed the marijuana in violation of the Controlled Substances Act, 35 P.S. § 780-113(a)(31)(i)?

Commonwealth's Brief at 4.

# **I**

The Commonwealth's first claim presents a multipart argument that the trial court erred in determining that the police lacked probable cause to conduct a warrantless search of Appellee's vehicle.[3]

We begin by noting that where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

**Commonwealth v. DeWitt**, 608 A.2d 1030, 1031 (Pa. 1992) (citations omitted).

Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect

---

[3] We refer to "Appellee's vehicle" for convenience, while we recognize that Appellee was a passenger in the vehicle that his wife was driving. In any event, the Commonwealth makes no claims that Appellee lacked standing to challenge the search of the vehicle, nor does it claim that he lacked a reasonable expectation of privacy therein.

individuals from unreasonable searches and seizures by police in areas where individuals have a reasonable expectation of privacy. An expectation of privacy exists if a person has a subjective expectation of privacy that society is willing to recognize as legitimate and reasonable. Where there exists a reasonable expectation of privacy, Article I, Section 8 and the Fourth Amendment generally require police to obtain a warrant, issued by a neutral and detached magistrate and founded upon probable cause, prior to conducting a search or seizure of a person and/or a person's property, unless one of the few well delineated exceptions apply. One such exception is the automobile exception, adopted by this Court in *Gary*, which permits the search and/or seizure of a motor vehicle if supported by probable cause—no separate finding of exigent circumstances is required.

*Commonwealth v. Loughnane*, 173 A.3d 733, 741 (Pa. 2017) (some citations omitted).

In the case *sub judice*, it is undisputed that the automobile exception applies if the police possessed probable cause to believe that a search of the vehicle would uncover evidence of a crime. "In determining whether probable cause exists, we apply a totality of the circumstances test." *Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009). "Probable cause is a practical, nontechnical conception: it is a fluid concept-turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules." *Commonwealth v. Glass*, 754 A.2d 655, 663 (Pa. 2000) (cleaned up).

The Commonwealth first asserts that it has long been the case that the odor of marijuana is alone sufficient to demonstrate probable cause to conduct a search. Commonwealth's Brief at 14-15. Second, the Commonwealth argues that, contrary to the trial court's analysis, this long-held rule has

neither been altered by intervening legislation, namely, the Medical Marijuana Act ("MMA"), 35 P.S. § 10231.101 *et seq.*, nor by our Supreme Court's recent decision in **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019) (holding that the presence of a concealed firearm, alone, does not provide police with reasonable suspicion that criminal activity is afoot). Commonwealth's Brief at 16-32. Third, the Commonwealth contends that even if the odor of marijuana does not itself establish probable cause, it is nonetheless a relevant fact that, in conjunction with other factors, may contribute to a finding of probable cause. **Id.** at 32-36. Under that view, the Commonwealth argues that the trial court erred by affording the odor of marijuana no weight in assessing the at-issue search under the totality of the circumstances test for probable cause, and by failing to consider other relevant factors.

### Prior Precedent

The Commonwealth first argues that prior precedent firmly establishes that the odor of marijuana, alone, provides probable cause to search a vehicle. Appellee partially concedes this point. **See** Appellee's Brief at 12-13 (stating that in **Commonwealth v. Stoner**, 334 A.2d 633 (Pa. Super. 1975), "the [C]ourt adopted the rationale in **United States v. Ventresca**, 380 U.S. 102 (1965)[,] and **Johnson v. United States**, 333 U.S. 10 (1948)[,] that an odor may be sufficient to establish probable cause for the issuance of a search warrant[,]" and that … "Pennsylvania courts held thereafter that the plain smell of marijuana alone was sufficient to establish probable cause due to marijuana's distinctive odor and illegal status"). Appellee rejects the notion

that the **Stoner** Court adopted a *per se* legal rule. However conceived, Appellee maintains, and the trial court agreed, that the plain smell doctrine was contingent upon the previously universal factual premise that the possession of marijuana was always and necessarily illegal; *i.e.*, the detection of marijuana by smell was previously *always* evidence of criminal activity. They argue that the MMA changed that universal factual assumption in Pennsylvania and, applying the reasoning of **Hicks**, the odor of marijuana is no longer alone sufficient to establish probable cause to believe criminal activity is afoot.

Initially, we agree with the Commonwealth that prior cases in this Commonwealth established that the odor of marijuana **may** be alone sufficient to establish probable cause for a search, as conceded by Appellee. We need not belabor that point; however, clarification of the nature of that rule is warranted. The Commonwealth seems to further argue that the odor of marijuana is **always** sufficient to establish probable cause under the prior precedent, suggesting the existence of a *per se* rule of law that applies regardless of any other circumstances known to an officer prior to his conducting a search. We disagree with this conception of the plain smell doctrine as a *per se* legal rule.

To the contrary, courts have routinely held that the odor of marijuana is **a factor** for consideration in a determination of the existence of probable cause, a factor that was dispositive, or almost always controlling, in the prior factual context of the substance's universal illegality. As this Court stated in

- 12 -

*Commonwealth v. Trenge*, 451 A.2d 701 (Pa. Super. 1982), "[a]t least since the Supreme Court of the United States decided *Johnson v. United States*, 333 U.S. 10 … (1948), it has been clear that probable cause *may* be established" by the odor of marijuana alone. *Trenge*, 451 A.2d at 706 (emphasis added). In *Johnson*, the Supreme Court explained:

> If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one *sufficiently distinctive to identify a forbidden substance*, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it *might very well be* found to be *evidence of most persuasive character*.

*Johnson*, 333 U.S. at 13 (emphasis added). Justice Jackson did not articulate a *per se* rule regarding the odor of obvious contraband in *Johnson*. Instead, he clearly expressed that the odor of a "forbidden" substance is a factor that "might" constitute evidence of the "most persuasive character" when considered in the totality-of-the-circumstances test for probable cause. *Id.*

In *Stoner*, this Court explicitly adopted the reasoning of *Johnson*, stating that the "Supreme Court of the United States has held that an odor *may* be sufficient to establish probable cause for the issuance of a search warrant." *Stoner*, 344 A.2d at 635 (citing *Johnson*) (emphasis added). The *Stoner* Court further opined that it "would have been a dereliction of duty for [an officer] to ignore the obvious aroma of an illegal drug which he was trained to identify." *Id.* *Stoner* neither departed from nor exceeded the rationale of *Johnson*, that the detection of an odor of a *prohibited* substance *may* be sufficient by itself to establish probable cause. Applying that rule in the

context of a legal environment where virtually every instance of possession of marijuana is illegal, the odor of marijuana becomes dispositive in establishing probable cause to conduct a search for that substance.

This is assuming, of course, yet another factual premise upon which all plain smell cases are contingent—that the odor in question is emanating from the location sought to be searched. *See, e.g.*, *Commonwealth v. Scott*, 210 A.3d 359, 365 (Pa. Super. 2019) (holding "the odor of burnt marijuana and small amount of contraband recovered from the passenger compartment of the vehicle did not create a fair probability that the officer could recover additional contraband in the trunk" because, citing the suppression court in that case, the "officers could only smell burnt marijuana as a result of [the defendant's] having just smoked a blunt in the car and therefore they could not discern the odor of fresh marijuana that would lead them to reasonably believe additional narcotics had been concealed within the vehicle"). While that factor is not at issue in this case, it further serves to demonstrate the absence of a *per se* rule giving police *carte blanche* authority to search based on the odor of marijuana despite any circumstances that might serve to undermine the otherwise strong inference of criminal activity that the odor typically implied. A *per se* rule undermines the very nature of the totality-of-the-circumstances test for probable cause, which is "a fluid concept-turning on the assessment of probabilities *in particular factual contexts* not readily, or even usefully, reduced to a neat set of legal rules." *Glass*, 754 A.2d at 663 (emphasis added).

Thus, contrary to the Commonwealth's claim, there is no preexisting, *per se* rule that the odor of marijuana is **always** sufficient to establish probable cause to believe a crime is being committed. Rather, the existing rule, properly stated, is that the odor of marijuana **may** alone be sufficient to establish probable cause to search in particular factual contexts. In practical terms, historically, the circumstances wherein the odor of marijuana would not alone be sufficient to establish probable cause were necessarily rare or even nonexistent when marijuana was, in all or virtually all circumstances, illegal to possess. To the extent that the Commonwealth suggests a *per se* rule existed prior to, much less survived the MMA, and that the trial court erred by failing to mechanically follow that rule once it deemed credible that the odor had been detected by the police, we deem that aspect of its claim to be meritless. The trial court was free to weigh the inference of criminality implied by the odor of marijuana against other relevant facts known to the officers in determining whether they possessed probable cause to conduct the search.

## MMA

Next, the Commonwealth contends that the MMA "did not legalize nor did it render possession or use of marijuana presumptively legal." Commonwealth's Brief at 18. Thus, the Commonwealth argues that the "MMA merely constitutes one limited exception" to the Controlled Substance, Drug, Device, and Cosmetic Act ("CSA") and that "Pennsylvania's long[-]standing

precedent that the smell of marijuana establishes probable cause …

control[s]." ***Id.***

In ***Commonwealth v. Jezzi***, 208 A.3d 1105 (Pa. Super. 2019), this

Court described the interplay between the MMA and the CSA as follows:

> This appeal involves the interplay of two public safety statutes; the first statute is the CSA, which describes five schedules of controlled substances. 35 P.S. § 780-104. In outlining the Schedule I substances, the Act states:
>
> **§ 780-104. Schedules of controlled substances**
>
> **(1) Schedule I—**In determining that a substance comes within this schedule, the secretary shall find: a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision. The following controlled substances are included in this schedule:
>
> ***
>
> (iv) Marihuana.
>
> 35 P.S. § 780-104(1)(iv) (effective June 14, 1972).
>
> The second statute is the MMA, which states in its declaration of policy:
>
> **§ 10231.102. Declaration of policy**
>
> The General Assembly finds and declares as follows:
>
> (1) Scientific evidence suggests that medical marijuana is one potential therapy that may mitigate suffering in some patients and also enhance quality of life.
>
> (2) The Commonwealth is committed to patient safety. Carefully regulating the program which allows access to medical marijuana will enhance patient safety while research into its effectiveness continues.
>
> (3) It is the intent of the General Assembly to:

(i) Provide a program of access to medical marijuana which balances the need of patients to have access to the latest treatments with the need to promote patient safety.

(ii) Provide a safe and effective method of delivery of medical marijuana to patients.

(iii) Promote high quality research into the effectiveness and utility of medical marijuana.

(4) It is the further intention of the General Assembly that any Commonwealth-based program to provide access to medical marijuana serve as a temporary measure, pending Federal approval of and access to medical marijuana through traditional medical and pharmaceutical avenues.

35 P.S. § 10231.102(1)-(4) (emphasis added). In essence, the MMA creates a temporary program for qualified persons to access medical marijuana, for the safe and effective delivery of medical marijuana, and for research into the effectiveness and utility of medical marijuana. *Id.*; 35 P.S. § 10231.301. Significantly, the MMA does not declare that marijuana is safe and effective for medical use; instead, the MMA is a temporary vehicle to access the substance pending research into its medical efficacy and utility. 35 P.S. § 10231.102(1)-(4).

Section 10231.303 of the MMA allows for the limited lawful use of medical marijuana, and pertinent to this case, Section 10231.304 emphasizes the unlawful use of medical marijuana:

### § 10231.304. Unlawful use of medical marijuana

**(a) General rule.**—Except as provided in section 303, section 704, Chapter 19 or Chapter 20, the use of medical marijuana is unlawful and shall, in addition to any other penalty provided by law, be deemed a violation of the [CSA].

**(b) Unlawful use described.**—It is unlawful to:

(1) Smoke medical marijuana.

(2) Except as provided under subsection (c), incorporate medical marijuana into edible form.

(3) Grow medical marijuana unless the grower/processor has received a permit from the department under this act.

(4) Grow or dispense medical marijuana unless authorized as a healthy medical marijuana organization under Chapter 19.

(5) Dispense medical marijuana unless the dispensary has received a permit from the department under this act.

**(c) Edible medical marijuana.—**Nothing in this act shall be construed to preclude the incorporation of medical marijuana into edible form by a patient or a caregiver in order to aid ingestion of the medical marijuana by the patient.

35 P.S. § 10231.304. Further, the MMA states: "The growth, processing, distribution, possession and consumption of medical marijuana permitted under [the MMA] shall not be deemed a violation of the [CSA]" and "[i]f a provision of the [CSA] relating to marijuana conflicts with a provision of [the MMA], [the MMA] shall take precedence." 35 P.S. § 10231.2101. In other words, compliance with the MMA will not constitute a crime under the CSA. *Id.*

*Jezzi*, 208 A.3d at 1111–12 (footnotes omitted).

As established above, the plain smell doctrine is a specific application of the totality-of-the-circumstances test for probable cause, crafted in light of the previously universal fact of marijuana's illegality and its distinctive odor. The MMA has clearly altered the underlying factual context in which that probable cause test applies. *See Amici* Brief at 5 ("The logical nexus between smelling marijuana in a car and the likelihood of finding unlawfully possessed narcotics is not immune to the effects of time and changes in law; it is affected and altered by both."). This much is true: marijuana is a prohibited substance

under the CSA, despite the passage of the MMA.[4]  However, it is undisputed that a substantial number of Pennsylvania citizens may now possess and consume marijuana legally pursuant to the MMA.[5]  Previously, every instance in which marijuana was detected by smell indicated the commission of a crime. Soon, hundreds of thousands of Pennsylvanians will become potential lawful sources of that same odor.  Thus, the strength of the inference of illegality stemming from the odor of marijuana has necessarily been diminished by the MMA in Pennsylvania.

The Commonwealth cites several post-MMA cases by this Court, implying that the MMA has not affected the plain smell doctrine.  However, the cited decisions do not preclude a finding by a suppression court that probable cause is lacking, despite a credible finding that police smelled marijuana coming from the location to be searched, nor do they provide analogous facts to the instant case that are controlling here.

First, in **Commonwealth v. Handley**, 213 A.3d 1030 (Pa. Super. 2019), the police responded to a report that Handley had an argument with a utility worker outside of his home, and that he had threatened to get a gun from inside the house.  **Id.** at 1033.  The worker also reported that he heard

---

[4] As the **Jezzi** Court held, "the CSA and the MMA can be read in harmony and given full effect…." **Jezzi**, 208 A.3d at 1115.

[5] As noted by *Amici Curiae*, nearly 163,000 Pennsylvania have active medical marijuana cards in Pennsylvania, and some 70,000 more are pending approval.  **See** *Amici* Brief at 4.  The Commonwealth does not dispute these statistics.

"four or five gunshots" after Handley returned to his residence. *Id.* When police arrived, they detected "a strong odor of marijuana" coming from the house. *Id.* Handley did not respond when the officers knocked on his door. *Id.* Additionally, the police observed a firearm inside the house from their vantage point on the front porch, and they further discovered marijuana leaves and stems protruding from garbage bags that were outside the home. *Id.* at 1033-34. Based on this information, the police obtained a warrant to search the home. *Id.* at 1034. A subsequent search yielded "33 marijuana plants and numerous jars containing marijuana." *Id.* Handley filed a suppression motion, which was denied.

On appeal, Handley argued that the police lacked probable cause to secure the search warrant. The **Handley** Court disagreed, stating, *inter alia*, that a "strong smell of marijuana emanating from a residence creates probable cause to procure a search warrant" and that "the odor of marijuana, in and of itself, was sufficient to support issuance of a warrant." *Id.* at 1035 (citing **Commonwealth v. Johnson**, 68 A.3d 930 (Pa. Super. 2013) (hereinafter, "**PA Johnson**," and **Commonwealth v. Waddell**, 61 A.3d 198 (Pa. Super. 2012)).

On first glance, **Handley** may appear to support the Commonwealth's position. However, under further scrutiny, it is easily distinguishable from the case *sub judice*. Although **Handley** was decided after passage of the MMA,

the search at issue in that case occurred several years prior.[6] Thus, at the time the warrant in **Handley** was secured, there was no possibility that Handley lawfully possessed the marijuana detected by the investigating officers pursuant to the MMA, and Handley presented no such claim on appeal. The **Handley** Court relied on prior expressions of the plain smell doctrine in **PA Johnson** and **Waddell**, both cases that were issued several years before the MMA could have contributed to the factual context in which a probable cause determination is made, and both of which involved facts that far exceeded the mere smell of marijuana as the justification for a search.[7]

_____

[6] As noted by the **Handley** Court, the MMA "took effect on May 17, 2016." **Id.** at 1036.  Handley's home was searched nearly a year before on August 27, 2015.  **Id.** at 1033.

[7] In **Waddell**, this Court did not 'hold' that the odor of marijuana was in-and-of-itself sufficient to establish probable cause.  Indeed, **Waddell** was not even a probable cause case.   The issue in **Waddell** was whether exigent circumstances existed to search a home without a warrant, not whether police possessed probable cause for the search.  **Waddell**, 61 A.3d at 207.  In any event, numerous facts supported a determination of probable cause in that case, including: a tip from an informant that the home was used for distributing marijuana; observations of suspicious persons going to and from the residence with backpacks purportedly containing marijuana; and a person stopped after leaving Waddell's residence, who was in possession of a large quantity of marijuana, told the police that he had obtained the marijuana from Waddell's home.  **Id.** at 208-29.  Only after recounting all those contributing facts did the **Waddell** Court state that "the evidence certainly surpassed the threshold necessary to establish probable cause after [police] detected the smell of marijuana emanating" from Waddell's home.  On appeal, Waddell even _conceded_ that probable cause existed.  **Id.** at 212.  Needless to say, there were ample facts supporting a finding of probable cause to conduct the search at issue in **Waddell** independent of the odor detected, and the

Additionally, there were more circumstances known to the officer in **Handley** when he obtained the warrant beyond the mere odor of marijuana. The officer responded to a reported threat and a report of shots fired, observed a firearm inside the residence, and discovered marijuana leaves and stems in the garbage outside the residence. The Commonwealth's extraction of a single sentence from the **Handley** opinion, outside that greater factual context in which the probable cause determination was made, does not convince us that the rule derived from **Stoner** and **Johnson** evolved into a *per se* test.

The Commonwealth also cites **Scott**, where police were patrolling in a high crime area when they stopped Scott's vehicle due to a malfunctioning brake light. **Scott**, 210 A.3d at 360-61. When the officer approached the vehicle, he **smelled** burnt marijuana, **saw** "smoke was still emanating from the vehicle," and then further **observed** Scott "attempt to place a [marijuana]

---

**Waddell** Court had simply opined in *dicta* that the odor of marijuana was the proverbial icing on the cake.

Similarly, in **PA Johnson**, which itself relied on **Waddell**, police received tips from two anonymous sources that the ultimately-searched trailer park home was being used for the sale of marijuana and prescription pills, and the sources gave a specific description of one of the female suspects. **See PA Johnson**, 68 A.3d at 931. When they arrived at the scene, police observed a woman who fit the provided description near the identified home. **Id.** at 932. When they approached the home, they detected the smell of burnt marijuana. **Id.** Based on those facts, the **PA Johnson** Court concluded that probable cause existed once the police detected the smell of marijuana. The **PA Johnson** Court did not state nor suggest that the smell of marijuana was alone sufficient to establish probable cause independent of the preceding tips and partial corroboration of those tips.

blunt" in the center console. *Id.* at 361 (emphasis added). The officer conducted a search of the passenger compartment and recovered the blunt and a small jar of marijuana. The officer then searched the trunk of Scott's vehicle, where he discovered an illegal firearm.

On appeal, Scott challenged only the search of his trunk, essentially conceding probable cause existed to search the passenger compartment. While presenting boilerplate law on the plain smell doctrine, the **Scott** Court correctly stated the standard that "an odor may be sufficient to establish probable cause[.]" *Id.* at 363 (quoting **Stoner**). It then cited the application of that rule in another case, which was just another rephrasing of the rule in **Stoner**, but from which the Commonwealth again attempts to construe a statement of a *per se* rule from a poorly-crafted recitation of boilerplate law that was not critical to the issue of probable cause in that case.[8] Indeed, the **Scott** Court held that, despite the odor of marijuana emanating from the vehicle, police did not possess probable cause to further search the trunk after having already discovered the likely source of the odor. *Id.* at 365 ("Under these circumstances, the odor of burnt marijuana and small amount of

_____

[8] The **Scott** Court quoted **Commonwealth v. Stainbrook**, 471 A.2d 1223, 1225 (Pa. Super. 1984), wherein this Court stated: "In **Stoner**, we analogized a plain smell concept with that of plain view and held that where an officer is justified in being where he is, his detection of the odor of marijuana is sufficient to establish probable cause." As discussed at length above, the applicable rule from **Stoner** is not a *per se* test. There is no suggestion in **Stainbrook** that the Court's omission of the word 'may' in its recitation of the standard was intentional, much less relevant to the holding in that case.

contraband recovered from the passenger compartment of the vehicle did not create a fair probability that the officer could recover additional contraband in the trunk.").

Moreover, although Scott was stopped a few months after the passage of the MMA, he did not present officers with a medical marijuana card, nor did he present an argument on appeal that the MMA altered the factual context in which probable cause is assessed based on the odor of marijuana. Indeed, the **Scott** Court did not address any issue related to the passage of the MMA. Accordingly, **Scott** also does not support the Commonwealth's arguments.

Next, in **Commonwealth v. Batista**, 219 A.3d 1199 (Pa. Super. 2019), this Court addressed the odor of marijuana's effect on probable cause determinations in light of the MMA, and that decision does provide some guidance in the instant matter. However, it does not decide the question before us, because it is distinguishable in several respects. In that case, the police received a tip from an unidentified source that Batista's home was being used to grow large quantities of marijuana, and that the odor of fresh marijuana was emanating from an exhaust vent on the first floor. *Id.* at 1201. When the police went to the house to investigate, they detected a strong smell of fresh marijuana coming out of a first-floor exhaust vent. *Id*. The police further testified that the exhaust vent and smell were consistent with all other grow houses they had previously investigated. *Id.* Based on those facts, they secured a warrant to search the premises, and upon execution of the warrant, they discovered 91 marijuana plants growing in Batista's home, and charged

him with possession with intent to deliver marijuana. Batista challenged the warrant for lack of probable cause, but the suppression court denied the suppression motion, and Batista was ultimately convicted. *Id.* at 1201-02.

On appeal, Batista claimed, *inter alia*, that "the smell of fresh marijuana can no longer serve as an element of probable cause in Pennsylvania" after passage of the MMA. *Id.* at 1204–05. The **Batista** Court disagreed, reasoning:

> The [MMA] is a limited exception to [the CSA]. Only a "grower/processor" or "dispensary", as defined under the MMA, may "receive a permit to operate as a medical marijuana organization to grow, process, or dispense medical marijuana." 35 P.S. § 10231.601. A grower is a "natural person, corporation, partnership, association, trust or other entity, or any combination thereof, which holds a permit from the Department [of Health] under this act to grow and process medical marijuana." 35 P.S. § 10231.103.
>
> To receive a grower permit under the MMA, a person must undergo an extensive application and permitting process through the Department. *See* 35 P.S. § 10231.602 (requiring, among other things, full, financial disclosure of all backers; descriptions of responsibilities within the partnership or corporation; criminal background checks; statements of "good moral character[";] title searches for the land use; and personal information for all investors).
>
> The number of authorized growers and processors who have completed that administrative process is currently very small. The General Assembly has capped the number of permits for growers. "The department may not initially issue permits to more than 25 growers/processors." 35 P.S. § 10231.616.
>
> Given the extremely limited number of permits that the Department has issued, we hold that, when an officer smells fresh marijuana emanating from a building that is a reported grow-house there still exists a fair probability that the marijuana inside is illegal. Law enforcement still holds the power and the duty to investigate that probability.

> Thus, Batista has failed to persuade us that enactment of the MMA abrogates our precedents holding that the aroma of marijuana contributes to the finding of probable cause.

*Batista*, 219 A.3d at 1205 (footnote omitted).

Contrary to the Commonwealth's claim that a *per se*, plain-smell rule exists, the ***Batista*** Court did not apply such a rule, instead characterizing the prior precedents as establishing the rule that the odor of marijuana **may contribute** to a finding of probable cause. ***Id.*** The Court considered whether the odor of marijuana, in conjunction with other circumstances, contributed to a finding of probable cause, and concluded that it did—a wholly unnecessary task if the odor of marijuana was alone sufficient to establish probable cause to search Batista's home.

The additional circumstances considered were both specific to the case and universal; specific in that the odor of marijuana, and its location, had directly corroborated a tip that marijuana was being illegally grown there, and universal in the sense that the Court deliberated on the likelihood that the detected marijuana might have complied in some sense with the MMA. Because the odor corroborated the tip, in addition to the fact that it was extremely unlikely that Batista had been granted one of a handful of licenses to grow marijuana under the MMA, the ***Batista*** Court concluded that the search warrant was supported by probable cause to believe that the marijuana detected was illegal.

Here, there was no tip suggesting that Appellee or the other passengers in the vehicle were illegally using marijuana, and Appellee presented the

officers with his MMA card prior to the search at issue. Moreover, while licenses to grow marijuana under the MMA are extremely limited—on the order a few dozen statewide—hundreds of thousands of Pennsylvania citizens will soon legally possess and consume marijuana pursuant to the MMA. Thus, the likelihood that police will encounter the lawful possession and use of marijuana through its odor pursuant to the MMA is exponentially greater than the likelihood that they will discover a lawful grow house, and no facts known to police before the search was conducted supported the belief that marijuana was being manufactured or sold in or from Appellee's vehicle. Thus, **Batista** does not control here.

We conclude, therefore, that the post-MMA cases cited by the Commonwealth do not control our decision and, consequently, we consider the question before us in the first instance. The Commonwealth contends that the MMA did not make marijuana presumptively legal, and that it remains presumptively illegal, despite the MMA. As a factual matter, the trial court credited expert testimony that there is no distinction between legal medical marijuana and contraband marijuana that can be detected through odor alone. **See** TCO at 7. Nevertheless, the Commonwealth maintains that all marijuana remains presumptively illegal, and that medical marijuana exists only as a limited exception to the CSA. As far as the Commonwealth asserts that the MMA is a limited exception to the CSA, we agree. **See Batista**, 219 A.3d at 1205. It does not follow that the odor of marijuana is always sufficient to establish probable cause, or, relatedly, that the MMA is irrelevant to the test

for probable cause. It would strain credulity to think the legislature intended that all medical marijuana users under the MMA—hundreds of thousands of Pennsylvanians already—may be presumptively subjected to searches by law enforcement due to the odor of marijuana alone. However, we need not read into the intent of the legislature here, because there is no statutory question before us. Lawful users of medical marijuana do not surrender their 4th Amendment rights merely because other citizens will continue to possess contraband marijuana in contravention of the CSA. The MMA has altered the fact of marijuana's previously universal illegality, and probable cause is a fact-driven standard "not readily, or even usefully, reduced to a neat set of legal rules." **Glass**, 754 A.2d at 663. Thus, we conclude that the trial court did not err in merely considering the passage of the MMA as a relevant fact in its probable cause analysis. The question remains, however, whether the lower court abused its discretion in concluding that the odor of marijuana cannot contribute to a finding of probable cause in the post-MMA environment.

### Hicks

Next, the Commonwealth argues that the trial court erroneously applied the reasoning of **Hicks** in granting Appellee's suppression motion. In **Hicks**, our Supreme Court held that possession of a concealed firearm by an individual in public is not sufficient to create a reasonable suspicion that the individual may be dangerous or committing a criminal offense, explicitly overruling this Court's longstanding decision in **Commonwealth v. Robinson**, 600 A.2d 957 (Pa. Super. 1991). **Hicks**, 208 A.3d at 947. Here,

- 28 -

the trial court "applied" **Hicks** in determining "that the plain smell of marijuana alone no longer provides authorities with probable cause to conduct a search of a subject vehicle. As marijuana has been legalized in Pennsylvania for medical purposes, the plain smell of burnt or raw **marijuana is no longer indicative of an illegal or criminal act**." TCO at 14-15 (emphasis added). The Commonwealth contends that **Hicks** is distinguishable because it was expressly limited to the possession of firearms, and that the rationale of **Hicks** cannot apply here because the possession of a concealed firearm is ostensibly not analogous to the possession of medical marijuana. Essentially, the Commonwealth maintains that possession of marijuana under the MMA is in a distinct legal category that makes it presumptively illegal in a manner that does not apply to the possession of a concealed firearm.

> In **Hicks**,

> at approximately 2:30 a.m., a remote camera operator conducting live surveillance of a gas station and convenience store … notified police officers that a patron of the establishment was in possession of a firearm. According to the suppression court's factual recitation, the camera operator advised officers that the observed individual showed the firearm to another patron, put the firearm in his waistband, covered it with his shirt, and walked inside the convenience store.

> The observed individual was Michael Hicks. It later emerged that Hicks possessed a valid license to carry a concealed firearm. **See** 18 Pa.C.S. § 6109(a) ("A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle throughout this Commonwealth."). Hicks was not statutorily prohibited from possessing a firearm. Accordingly, on the morning in question, and at the observed location, there was nothing unlawful about Hicks' possession of his handgun, nor the manner in which he carried it.

> While responding police officers were en route, Hicks entered and exited the convenience store, then reentered his vehicle. Before Hicks could exit the parking lot, numerous police officers in marked vehicles intercepted and stopped Hicks' vehicle. Believing that Hicks had moved his hands around inside the vehicle, Officer Ryan Alles drew his service weapon as he approached Hicks' vehicle and ordered Hicks to keep his hands up.

**Hicks**, 208 A.3d at 922 (cleaned up).

The police conducted a **Terry**[9] search and discovered a bag of marijuana in Hicks' possession. Hicks sought to suppress the evidence based on the theory that the police lacked reasonable suspicion to conduct the **Terry** search merely because he was observed with a concealed firearm. The suppression court denied his motion, relying on **Robinson**, where the Superior Court held that possession of a concealed weapon in public creates a reasonable suspicion justifying an investigatory stop in order to investigate whether the person is

---

[9] **See Terry v. Ohio**, 392 U.S. 1 (1968). Importantly,

> [o]ur Supreme Court has defined three forms of police-citizen interaction: a mere encounter, an investigative detention, and a custodial detention. **Commonwealth v. Boswell**, … 721 A.2d 336, 340 (Pa. 1998). A mere encounter between police and a citizen "need not be supported by any level of suspicion, and carr[ies] no official compulsion on the part of the citizen to stop or to respond." **Commonwealth v. Riley**, 715 A.2d 1131, 1134 (Pa. Super. 1998).

> An investigatory stop, which subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute an arrest, requires a reasonable suspicion that criminal activity is afoot. **See Terry**…, 392 U.S. [at] 21…. A custodial detention is an arrest and must be supported by probable cause. **Id.**

**Commonwealth v. Fuller**, 940 A.2d 476, 478–79 (Pa. Super. 2007).

properly licensed (the "**Robinson** rule"). **See Robinson**, 600 A.2d at 960-61. After this Court affirmed the order denying suppression, our Supreme Court reversed, thereby overturning **Robinson**.

The **Hicks** Court began with an examination of the laws regulating the possession of firearms. The Court concluded that carrying a firearm in Pennsylvania is generally legal but subject to a few exceptions, one of which being a prohibition on carrying a concealed firearm without a license. **Hicks**, 208 A.3d at 926. Nevertheless, the court recognized that "there can be no doubt that a properly licensed individual who carries a concealed firearm in public engages in lawful conduct. Indeed, millions of people lawfully engage in this conduct on a daily basis." **Id.** The **Robinson** rule, the **Hicks** Court reasoned, "characterizes the carrying of a concealed firearm as *per se* reasonable suspicion authorizing" a **Terry** stop "in order to investigate whether the person is properly licensed." **Id.** at 928. Hicks argued that nothing about his conduct gave rise to reasonable suspicion of criminal activity, including his carrying of a concealed weapon, which is lawful in Pennsylvania when licensed, and that **Robinson** was, *inter alia*, a misapplication of **Terry**. **Id.** The Commonwealth maintained "that the *per se* approach of **Robinson** is a justifiable application of the **Terry** doctrine," and it emphasized that, "under the totality of the circumstances, 'wholly lawful conduct might justify the suspicion that criminal activity [is] afoot.'" **Id.** at 928–29 (quoting **Reid v. Georgia**, 448 U.S. 438, 441 (1980)).

After a thorough review of 4th Amendment case law from this and other jurisdictions, the **Hicks** Court found "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public." **Id.** at 936. Thus, the "**Robinson** rule improperly dispenses with the requirement of individualized suspicion and, in so doing, misapplies the overarching totality of the circumstances test." **Id.** at 937.  The Court explained:

> Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, **see** 18 Pa.C.S. §§ 6105-06, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance.  As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal.  Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

**Id.** at 936–37.  Thus, the **Hicks** Court held that the **Robinson** rule violated the principles of the 4th Amendment because, "with no other criterion beyond the fact of an individual's possession of a concealed firearm necessary to justify a seizure, the **Robinson** rule allows a police officer to base the decision to detain a particular individual upon an 'inchoate and unparticularized suspicion' or 'hunch' that the individual is unlicensed and therefore engaged in wrongdoing." **Id.** at 946 (quoting **Terry**, 392 U.S. at 27).

We agree with the Commonwealth that the trial court's direct application of *Hicks* to the circumstances of this case constituted an abuse of discretion. First, as is obvious, the holding in *Hicks* could not directly apply because it concerned what constitutes reasonable suspicion of criminality justifying a *Terry* stop when possession of a concealed firearm is observed, not whether probable cause to search a vehicle exists based on the odor of marijuana alone. Moreover, even assuming the trial court merely adopted the reasoning of *Hicks*, the respective conduct is not sufficiently analogous to compel an identical result. The possession of a firearm is generally legal, with limited exceptions. The possession of marijuana, by contrast, remains generally illegal, but for the limited exception of lawful possession of medical marijuana pursuant to the MMA.

Thus, we simply cannot sustain the trial court's conclusion, based on *Hicks*, that because "marijuana has been legalized in Pennsylvania for medical purposes, the plain smell of burnt or raw marijuana is no longer indicative of an illegal or criminal act." TCO at 15. The odor of marijuana may still be indicative of an illegal or criminal act, because the possession of marijuana remains generally illegal. This is especially true when other circumstances suggest that the detected marijuana cannot be in compliance with the MMA, such as was the case in *Batista*.

However, the reasoning in *Hicks* is not completely irrelevant here. While there is a legal distinction to be made between possession of marijuana and possession of a concealed firearm, the *Hicks* decision was not premised solely

on the general legality of firearms. ***See Hicks***, 208 A.3d at 945 ("The seizure at issue was not unconstitutional due to the statutory classification of Hicks' license; it was unconstitutional because the police officers had no way of determining from Hicks' conduct or appearance that he was likely to be unlicensed and therefore engaged in criminal wrongdoing."). It remains a fact that police cannot distinguish between contraband marijuana and medical marijuana legally consumed by a substantial number of Pennsylvanians based on odor alone,[10] just as police cannot determine from a person's possession of a concealed firearm that he or she is unlicensed to carry it concealed.

The Commonwealth argues that there is no way for law enforcement to determine whether someone is complying with the MMA "absent investigation," and therefore the MMA "cannot have a negative impact on an officer's assessment of probable cause." Commonwealth's Brief at 27. The second proposition does not flow from the first. It is precisely because the police cannot discern lawful from unlawful conduct by the odor of marijuana alone that the police may need to rely on other circumstances to establish probable cause to believe that the possession of marijuana detected by that odor is criminal.

_____

[10] The Commonwealth contests this point, arguing that the smell of burnt marijuana indicates that the substance had been smoked, which is illegal under the MMA. Commonwealth's Brief at 31. However, the trial court credited the expert witness's testimony that vaporizing medical marijuana, which is a legal method of consumption under the MMA, produces an identical odor to burning marijuana. ***See*** TCO at 14.

To the extent that the Commonwealth implies that the MMA exists only as an affirmative defense to the CSA, and that compliance with the MMA is a matter irrelevant to the probable cause test, there is no statutory support for such a claim. Although marijuana is generally illegal under the CSA, nowhere in the MMA does the legislature purport to create an affirmative defense to CSA crimes. Rather, the MMA declares that medical marijuana is legal, and that it takes precedence over conflicting provisions in the CSA. **See** 35 Pa.C.S. § 10231.2101.

In any event, even if the MMA provides an affirmative defense to the CSA, the **Hicks** Court rejected the so-called "element-or-defense" test for 4th Amendment questions:

> The element-or-defense test amounts to a "seize now and sort it out later" approach. This is antithetical to the foundational protections of the Fourth Amendment. It casts too wide a net, with no regard for the number of law-abiding citizens ensnared within.

**Hicks**, 208 A.3d at 944. The Court further elaborated that "it is certainly the legislature's prerogative to define the elements of crimes and to set forth affirmative defenses. However, the constitutionality of enforcement tactics is a matter of judicial concern." **Id.** at 943.

One of the primary concerns when courts consider the constitutionality of a search or seizure is whether individualized suspicion is present.

> In addition to the reasonableness of the search and seizure, the Fourth Amendment generally requires the presence of individualized suspicion to justify a seizure. **City of Indianapolis v. Edmond**, 531 U.S. 32, 37 (2000); …. The courts of this

Commonwealth and federal courts have recognized limited circumstances where the general rule does not apply.

***Commonwealth v. Mistler***, 912 A.2d 1265, 1271 (Pa. 2006). No recognized exceptions apply in this case, and the Commonwealth presents no argument to that effect. As such, particularized suspicion was required to justify the search. In this regard, the ***Hicks*** Court instructs:

> When many people are licensed to do something, and violate no law by doing that thing, common sense dictates that the police officer cannot assume that any given person doing it is breaking the law. Absent some other circumstances giving rise to a suspicion of criminality, a [search or] seizure upon that basis alone is unreasonable.

***Hicks***, 208 A.3d at 945.

Here, 'many people' are licensed to consume marijuana under the MMA, and 'violate no law' by doing so. The odor of marijuana alone, absent any other circumstances, cannot provide individualized suspicion of criminal activity when hundreds of thousands of Pennsylvanians can lawfully produce that odor. What it does provide to police is a general, probabilistic suspicion of criminal activity based on the fact that most citizens cannot legally consume marijuana. Thus, it is a factor that can contribute to a finding of probable cause, consistent with prior precedent discussed above, assuming some other circumstances supply more individualized suspicion that the activity is criminal. This does not imply a change in the probable cause test, because, previously, the possession of marijuana was universally illegal. That universal factual circumstance established particularized suspicion of criminal activity, because ***every*** instance of possession of marijuana was previously a crime.

However, here, the trial court afforded the odor of marijuana no weight in its determination that police lacked probable cause to search Appellee's vehicle. That extreme view is not justified by the **Hicks** decision. The general illegality of marijuana under the CSA cannot simply be ignored merely because it is lawfully used in limited circumstances under the MMA and, thus, we must reject the trial court's conclusion that the odor of marijuana provides no indication of criminal activity. At the same time, those who act in compliance with the MMA should not be subjected to searches based solely on a generalized suspicion that is provided by that odor when the 4th Amendment also requires particularized suspicion.

**Other Factors Supporting a Finding of Probable Cause**

In the Commonwealth's final suppression argument, it contends that, even assuming the odor of marijuana does not alone establish probable cause, it can still be a contributing factor to a finding of probable cause. As discussed above, we agree with this general statement of the state of the plain smell doctrine. The Commonwealth further argues that "there were ample other uncontradicted factors in addition to the smell of burnt marijuana that when considered in their totality and objectively, provided police with … probable cause to support the search of the vehicle." Commonwealth's Brief at 32. Specifically, the Commonwealth contends that the following factors were not adequately considered by the trial court: 1) Trooper Prentice's training and experience with regard to narcotics investigations; 2) Trooper Prentice's identification of the area where Appellee's vehicle was stopped as a high crime

area; 3) Appellee's numerous statements prior to the search; and 4) Appellee's change in demeanor upon the arrival of more police officers. *Id.* at 33-34. The Commonwealth asserts that a "common sense and objective view of these facts" adds up to probable cause to believe that criminal activity was afoot. *Id.* at 34.

Assuming the trial court found the officers' testimony entirely credible, it should have considered those factors, in addition to the odor of marijuana, in determining whether police possessed probable cause to search Appellee's vehicle. Unfortunately, and perhaps because the trial court afforded no weight to the odor of marijuana as a contributing factor to a finding of probable cause based on its misapplication or overstatement of *Hicks*'s applicability here, the court failed to provide us with discrete credibility assessments relevant to the other potential factors affecting probable cause in its opinion.

For instance, the Commonwealth contends that Trooper Prentice essentially testified that Appellee's vehicle was stopped in a 'high crime area.' However, while we acknowledge the trooper testified that he had made many drug and gun arrests in the area of the stop, *see* N.T., 7/17/19, at 14, he did not offer an opinion as to whether that area was any more likely to produce gun and/or drug arrests than any other area. Thus, we cannot state that it is clear and uncontradicted from the record that the stop occurred in a high crime area, or simply in an area where Trooper Prentice has conducted arrests for common crimes. The trial court did not include this aspect of Trooper Prentice's testimony in the summary of its findings of fact, nor include it in its

legal analysis. If this was because the court determined that Trooper Prentice's testimony did not establish that the stop occurred in a high crime area, it did not say so.

Similarly, the Commonwealth contends that Appellee's statements and related behavior preceding the search, in conjunction with the odor of marijuana, should have also been considered in the trial court's probable cause analysis. Although the trial court recounted those statements in its findings of fact, the court did not appear to consider them at all. If the court believed those statements did not contribute in any way to a potential finding of probable cause to suspect criminal activity, it failed to explain how it reached that conclusion. Nor did the trial court address the trooper's observation that Appellee's demeanor changed when backup arrived.

In sum, the factual record before us is inadequate to conclude whether police possessed probable cause to search Appellee's vehicle. While the odor of marijuana may contribute to a finding of probable cause, as possession of marijuana remains illegal generally, the odor alone does not imply individualized suspicion of criminal activity, and Appellee's presentation of an MMA card was at least one factor that tends to undermine the inference of criminality. However, other potentially relevant factors were not considered by the trial court, and the court's credibility assessments of the testimony ostensibly establishing those factors are not in the record. Thus, the most prudent course of action is to remand for reconsideration by the trial court under the appropriate standard.

Accordingly, we conclude that we must vacate the order granting suppression and remand for reconsideration of that motion by the trial court given the deficiencies in the court's opinion identified herein.  We instruct the court that while it is not compelled by case law to find that probable cause exists solely on the basis of the odor of marijuana, that fact may, in the totality of the circumstances, still contribute to a finding of probable cause to believe the marijuana detected by the odor was possessed illegally.  The court may consider Appellee's presentation of an MMA card as a factor that weighs against a finding of probable cause, as it provides at least some evidence tending to suggest the marijuana in question was possessed legally.[11] However, the court must also consider (or explain why it need not consider) the other factors suggested by the Commonwealth as contributing to a finding of probable cause, such as Appellee's statements and demeanor during the stop, as well as the nature of the location of the stop.

## II

---

[11] The Commonwealth complains that police cannot immediately ascertain whether a MMA card is valid at this time.  However, even if true, that fact does not render presentation of an MMA card irrelevant to the court's probable cause analysis.  Nevertheless, the presentation of an MMA card does not automatically defeat a finding of probable cause, either.  It is plausible that circumstances in a particular case might demonstrate that an officer has a reasonable belief that a card is invalid, or that the manner of possession of medical marijuana is not compliant with the MMA.  It is also possible that a person possessing a valid MMA card may also possess contraband marijuana.  Whether any such circumstances exist in this case is for the trial court to decide in the first instance.

The Commonwealth also contends that the trial court erred when it granted Appellee's *habeas* motion to dismiss the PSAM charge.[12]   The court determined that the Commonwealth failed to establish a *prima facie* case for that offense due to the suppression of the seized marijuana.  **See** TCO at 16 n.20.   The Commonwealth argues that the court "cannot enter an order dismissing the charges unless the Commonwealth consents or the time for filing a notice of appeal [from the order granting suppression] has elapsed." Commonwealth's Brief at 37 (citing **Commonwealth v. Micklos**, 672 A.2d 796, 801 (Pa. Super. 1996) (*en banc*)).  This is a pure question of law and, therefore, our standard of review is plenary.  **Commonwealth v. Karetny**, 880 A.2d 505, 513 (Pa. 2005) (stating "it is settled that the evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law as to which an appellate court's review is plenary").

In **Micklos**, an *en banc* panel of this Court considered "whether the Commonwealth may appeal from an order of court which granted a criminal defendant's suppression motion and concurrently dismissed all charges filed against that defendant, thereby preventing the Commonwealth from pursuing its right to appeal the adverse rulings of a suppression court." **Micklos**, 672 A.2d at 798.   The Court proceeded "under the assumption that defense counsel first presented the motion to suppress at the close of testimony"

---

[12] The offense of PSAM is defined as "the possession of a small amount of mari[j]uana only for personal use[.]" 35 P.S. § 780-113(a)(31)(i).

- 41 -

during a non-jury trial. *Id.* at 799. The trial court granted the suppression motion, and on that basis, dismissed the charges that were contingent upon the suppressed evidence.

The *Micklos* Court first determined that jeopardy had attached when the defendant filed his suppression motion, as the evidentiary portion of the trial had already concluded. *Id.* at 800. In typical circumstances, when a suppression motion is timely filed in a pre-trial setting, the Commonwealth has, pursuant to Pa.R.A.P. 311(d), the right to appeal from an adverse suppression ruling upon certification that the prosecution is substantially handicapped. *See* Pa.R.A.P. 311(d) ("In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution."). Because jeopardy had already attached, the *Micklos* Court observed that "the trial court lacked power to dismiss before allowing the Commonwealth an opportunity to appeal the adverse suppression ruling." *Id.* at 801.

Appellee distinguishes this matter from *Micklos*, arguing that the procedural posture of this case, where both the suppression motion and *habeas* petition were filed and decided before trial, is critically different from *Miklos*, where the trial had already begun, and jeopardy had attached. *See* Appellee's Brief at 35-36. We agree. Here, the Commonwealth was not deprived of the opportunity to appeal from the adverse suppression ruling, as

jeopardy has not yet attached to this case. Furthermore, Appellee was required to file both motions pursuant to Pa.R.Crim.P. 578. *See* Pa.R.Crim.P. 578 ("Unless otherwise required in the interests of justice, all pretrial requests for relief shall be included in one omnibus motion.").[13] The trial court certified the order denying both motions for immediate appellate review pursuant to Pa.R.A.P. 341(c). Additionally, it is well-established that "[w]hen a charge is dismissed on a pre-trial writ of *habeas corpus*, the Commonwealth may appeal." *Commonwealth v. Huggins*, 836 A.2d 862, 865 n.2 (Pa. 2003). Presently, both the suppression and *habeas* issues are properly before this Court. Accordingly, we conclude that *Micklos* is inapplicable here, and that the Commonwealth's claim lacks merit on that basis.[14]

Nevertheless, the order granting Appellee's *habeas* motion cannot stand, given our disposition with regard to the Commonwealth's first claim. The trial court explicitly conditioned its dismissal of the PSAM charge on its granting of suppression. *See* TCO at 16 ("*As a result* of this [c]ourt's … suppression of the evidence seized from the subject vehicle, this [c]ourt finds that the Commonwealth failed to establish a *prima facie* case of [PSAM].") (emphasis added). Accordingly, we vacate the order granting Appellee's

---

[13] The official comment to Rule 578 notes that such relief includes requests "(3) for suppression of evidence[, and] … (5) to quash or dismiss an information[.]" Pa.R.Crim.P. 578 (comment).

[14] We note that the Commonwealth provides little more than a citation to *Micklos*, and no analysis of the facts of that case, in its single-page argument in support of this claim. *See* Commonwealth's Brief at 37.

*habeas* petition, and remand for reconsideration of that petition following the trial court's reevaluation of the suppression issue.

Order granting suppression and *habeas* relief **vacated**. Case **remanded** for reconsideration consistent with the analysis set forth in this opinion. Jurisdiction **relinquished**.

Judge Lazarus joins this opinion.

Judge Strassburger joins and files a concurring opinion in which President Judge Emeritus Bender and Judge Lazarus join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/25/20</u>